IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2019

**IN RE ANTONIO J. ET AL.**

**Appeal from the Circuit Court for Trousdale County**
**No. 2018-CV-4688     Clara W. Byrd, Judge**

_____

**No. M2019-00255-COA-R3-PT**

_____

Mother appeals the termination of her parental rights on grounds of persistence of conditions and failure to manifest a willingness and ability to assume custody. The trial court's order is affirmed in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and ANDY D. BENNETT, JJ., joined.

Tiffany D. Hagar, Lebanon, Tennessee, for the appellant, Selah W.

Herbert H. Slatery, III, Attorney General and Reporter; Jeffrey D. Ridner, Assistant Attorney General; Erin A. Shankleford, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I.     BACKGROUND**

This case involves the termination of Respondent/Appellant Selah W.'s[1] ("Mother") parental rights to her two children: Mason G., born in 2015, and Antonio J., born in 2014. The children were placed in the custody of Petitioner/Appellee Tennessee Department of Children's Services ("DCS") by the Trousdale County Juvenile Court ("the juvenile court") on July 29, 2016. Thereafter, Mother was incarcerated on two separate occasions and went a period of approximately eighteen months without any contact with her children. Eventually, on February 26, 2018, DCS filed a petition in the

_____

[1] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

Circuit Court of Trousdale County ("the trial court") to terminate Mother's parental rights.[2] As grounds for termination against Mother, the petition alleged persistence of conditions and failure to manifest a willingness and ability to assume custody.

A trial on the termination petition took place on November 27, 2018. At trial, the proof showed that the children entered DCS custody due to allegations of environmental neglect. Initially, the children were found to be playing in the street without supervision. The children were also suffering from sores that resembled impetigo.[3] An investigation revealed that the home where Mother and the children resided contained no necessities for children their age, such as diapers or cribs, the home was littered with refuse, and a knife and tobacco products were accessible to the children. Mother, the children, maternal grandmother, and at least five other people lived in the two-bedroom home at the time. Mother later stipulated that the children were dependent and neglected based on the environmental neglect allegations, and an order of dependency and neglect was entered on August 31, 2016. Mother later signed a notice indicating that she received a copy of the Criteria and Procedures for Termination of Parental Rights.

DCS created various permanency plans for Mother to complete, focused on Mother finding a stable home, completing and following the recommendations of various assessments, obtaining stable employment, and maintaining visitation with the children. Mother completed the required assessments in March 2018. During her parenting assessment, Mother admitted that she often needs a third party to provide money for food or clothing for the children or to provide care for the children. The parenting assessment recommended follow-up education and therapy, which Mother did not complete.

A mental health assessment recommended counseling and medication for Mother's previously diagnosed mental health issues; although Mother was medicated while incarcerated, she declined medication upon release. According to Mother, she was unable to pay for mental health treatment but was now taking steps to obtain grants to pay for the medication. Her drug and alcohol assessment also recommended ongoing education and treatment for Mother's admitted addiction issues. Mother participated in no more than a single abuse education class, again citing a lack of funds. Mother also failed to participate in parenting education prior to trial, stating that she was "in the process of that right now[.]"

Although Mother was allowed supervised visitation provided that she could pass a drug screen, Mother did not consistently visit the children following their removal. The proof at trial showed Mother saw the children once at court in August 2016 and then did not visit the children again for eighteen months. Part of this lack of visitation stemmed

---

[2] The petition also requested termination of the parental rights of Antonio's father. The trial court terminated this individual's parental rights after he did not participate in the proceeding, and he is not at issue in this appeal.

[3] Impetigo is an "infection of the skin" that is highly contagious. *Mosby's Dictionary of Medicine, Nursing & Health Professions* 909 (9th ed. 2013)

from Mother's incarceration in July 2016 for approximately one month for possession of stolen property, and again from July 2017 to late December 2017 for a probation violation. Mother testified that her failure to seek visitation following her initial release from incarceration was related to her continued drug use. In June 2017, Mother failed a drug screen for THC and several other illegal substances. Mother thereafter passed all drug tests that were administered to her. Still, Mother did not attempt to resume visitation until February 2018, around the time the termination petition was filed. Thereafter Mother missed many of the scheduled visits, apparently due to sickness and/or transportation issues. On some occasions, Mother provided no notice that she was unable to attend, simply failing to show up for the visits while the children were waiting. Communication was also sometimes an issue with Mother. For example, Mother had no contact with DCS in October 2018; Mother blamed her communication issues on her inability to afford a phone due to losing her job.

Mother's employment and housing history were also discussed at trial. Mother was no longer living in the home where the children were removed. Mother reported to DCS various addresses throughout the pendency of this case. By the time of trial, she was living in a trailer with her fiancé, his mother, and his mother's boyfriend. Mother testified that she had been with her fiancé for approximately ten months and living together for no more than four months. She admitted that her fiancé was a felon, but testified that she could not remember what crime or crimes he had been convicted of. DCS inspected the home and found nothing to indicate that it was inappropriate for the children. Mother, however, told DCS that this home was not permanent and testified at trial that she was attempting to save up for other housing. According to Mother, it would take no more than a couple months to save up for housing. Mother admitted, however, that she also had no driver's license or car. As such, she often relied on neighbors and family members to drive her to work or visitation. The only impediment to Mother obtaining a driver's license was paying the fee for reinstatement. Mother admitted that she had driven another individual's car on some occasions despite her lack of driver's license. Mother's fiancé likewise has no car or driver's license, was not currently employed, has a history of substance abuse, and was still married to another woman at the time of trial.

After being released from incarceration, Mother held various jobs for no more than a few months at a time. For approximately two months prior to trial, Mother worked at a factory earning nearly $2,000.00 per month in gross pay. During this time, Mother was not required to pay any set expenses, but merely helped out when she could. For example, Mother testified that in the prior month she paid the electric and water bills, which amounted to approximately $207.00 per month. Mother also had no more than $50.00 per month in child support deducted from her pay, which Mother never paid the full amount on.[4] Despite these facts, Mother testified that she still needed to save up

---

[4] The most Mother paid in any one month was $46.12. There was some confusion at trial as to Mother's obligation. At trial, Mother admitted that she was required to pay $50.00 per month per child, for a total $100.00 per month obligation. The notarized affidavit of arrears contained in the record sets

money for her own apartment, her remaining fees from her criminal conviction, a driver's license, and a car. Mother testified that she had a job interview at a factory in the coming days or a job in retail.

Mother claimed that her lack of progress toward completing many of the tasks at issue in this case stemmed from her lack of consistent employment and the resulting lack of income. Mother admitted, however, that she was aware of how to obtain governmental assistance for her children, such as food stamps and WIC, but unaware of how to obtain assistance for herself until immediately before trial. When the trial court suggested free Alcoholics Anonymous or Narcotics Anonymous meetings, Mother said that she did not think of those options but that she would "look into it." Mother further admitted that she was not currently financially stable, has no current set plan for the children's return,[5] and would need another three to six months to "figure it out."

The children were placed with their current foster family ("Foster Family") immediately following the removal; the children remained in this placement continuously. The evidence shows that the children are closely bonded with Foster Family, particularly Tammy T. ("Foster Mother"). After the eighteen-month period with no visitation, the children did not know Mother. As such, Mother was advised to show the children pictures of herself with the children to deepen their bond. This tactic apparently worked, and the children now refer to Mother as "Mom." According to Foster Mother, however, when the children first began therapeutic visitation with Mother, the older child started to have nightmares and became very frightened of being taken away from Foster Family. He also regressed in his potty training. Foster Mother testified that it took considerable effort and patience, but that the child was doing better.

The trial court entered a final order granting DCS's petition on January 9, 2019. Therein, the trial court made detailed findings of fact that both grounds alleged in the petition had been proven by clear and convincing evidence, as well as that termination was in the children's best interest. Mother thereafter timely appealed to this Court.

## II.    ISSUES PRESENTED

As we perceive it, this appeal involves two central issues:

1. Whether the trial court erred in finding clear and convincing evidence of grounds for termination of Mother's parental rights?

---

Mother's obligation as only $50.00 per month. By the time of trial, the affidavit showed that Mother was over $170.00 in arrears for the year 2018 based on this $50.00 figure.

[5] For example, Mother was not sure how the youngest child would be able to attend school because she voluntarily chose not to vaccinate him. Foster Mother testified that the child is now fully vaccinated. Mother also testified that she had not looked into any daycares where she currently lived and that she would need to rely on friends and "neighbors and stuff" for child care. Mother also claimed maternal grandmother could look after the children, although the two had not actually discussed such an arrangement and they live forty-five minutes apart.

2. Whether the trial court erred in finding clear and convincing evidence that termination of Mother's parental rights was in the children's best interest?

### III. STANDARD OF REVIEW

### IV.

The Tennessee Supreme Court has previously explained that:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove: (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interests by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable

. . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## V.   DISCUSSION

### A. Grounds for Termination

The trial court found two grounds for termination of Mother's parental rights: persistence of conditions and failure to manifest an ability and willingness to assume custody. In this case, the evidence supporting each ground generally overlaps. This, however, is not a bar to finding multiple grounds for termination. *See* Tenn. Code Ann. § 36-1-113(g) ("[A]cts or omissions in one ground does not prevent them from coming within another ground[.]"). We will therefore consider each ground in turn.

#### a.  Persistence of Conditions

At the time the petition at issue was filed, Tennessee Code Annotated section 36-1-113(g) provided a ground for termination commonly referred to as persistent conditions defined as follows:

> The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:
>
> (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;
>
> (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and
>
> (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[6] A parent's failure to remedy the conditions that led to removal need not be willful. ***In re Dakota C.R.,*** 404 S.W.3d 484, 499 (Tenn. Ct. App. 2012). Rather,

---

[6] This ground for termination was also amended in July 2018. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The current version of the statute provides a ground for termination where

> (A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
>> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
>> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.
>
> (B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

Neither party argues that this Court should apply the current version of the statute; as such, we apply the version in effect at the time the termination petition was filed.

A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care. Where . . . efforts to provide help to improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified. The purpose behind the persistence of conditions ground for terminating parental rights is to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child.

*In re Dakota C.R.*, 404 S.W.3d at 499 (internal citations and quotation marks omitted).

The trial court made the following findings in support of this ground for termination:

At the time of this hearing on the Termination Petition, it had been approximately thirty (30) months since the children were placed in DCS custody. The children were initially removed from the custody of their parents and placed into foster care based upon the home being in such unsanitary, deplorable, and unsafe condition that it was not appropriate for the children to remain in the home. The children were adjudicated as dependent and neglected on August 11, 2016.

The conditions that led to removal still persist as to the mother. The mother has consistently failed to maintain appropriate housing that would support her and the children. DCS had made reasonable efforts to assist mother in rectifying these conditions, by making referrals to assist the mother with services to address her parenting and her substance abuse issues. DCS also facilitated therapeutic visitation after the mother served a significant period of incarceration. DCS offered to provide transportation to and from said visits. DCS created permanency plans to work toward reuniting the children with their parents. Nonetheless, in nearly thirty (30) months, the mother still does not have appropriate housing for her and the children, does not have a driver's license, does not have a car, and is currently unemployed. There is little chance that mother will be able to rectify her condition in the immediate future as the children have been in DCS custody for a lengthy period and mother has not rectified these conditions yet. The bottom line is that the mother continues to lack the stability necessary to ensure the children are raised appropriately.

The children were adjudicated dependent and neglected in August 2016, far more than six months prior to the filing of the termination petition at issue. As such, this ground is clearly applicable. Moreover, following our review of the record, we conclude that the

evidence does not preponderate against the trial court's factual findings in support of this ground.

Mother's central argument with regard to this ground is that the conditions that led to the removal of the children, specifically issues with the fitness of the home the children were staying in and supervision of the children, do not continue to persist. Mother contends that other conditions considered by the trial court, such as lack of transportation, substance abuse issues, lack of employment, were never found by any court to be the basis of the removal of the children. We generally agree that the evidence shows that Mother now lives in a clean and safe home and there have been no concerns during therapeutic visitation as to lack of supervision. This ground for termination, however, is not limited only to those conditions that led to the child's removal, but allows the court to also consider "other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A). Thus, neither the trial court nor this Court is confined in our review only to those conditions that were expressly found to support the dependency and neglect findings.

Our review supports the trial court's finding that there are conditions that remain present that would likely cause the children to be subjected to further neglect and that these conditions are likely to remain for the near future. Here, despite the fact that the children have been removed from Mother's care for over two years, Mother's ability to care for the children in the near future is dubious. Mother removed herself completely from the children's lives following the DCS removal; she committed a crime and probation violation that resulted in significant incarceration and then failed to promptly seek visitation with her children after her release, choosing instead to abuse drugs during this time. Even thirty months into this separation, Mother's efforts to visit her children are hampered by her lack of transportation and lack of consistent means of communication. Moreover, although Mother often blames lack of employment and funds on her inability to make any progress in nearly every aspect of her life, the evidence shows that at times Mother was earning nearly $2,000.00 per month, while not being required to expend funds much more than $250.00 per month toward expenses. Thus, it is not economic disadvantage alone that prevents Mother from parenting her children, but Mother's refusal or inability to focus her efforts and her funds toward reunification. *Cf. In re M.B.*, No. M2005-02120-COA-R3-PT, 2006 WL 1082827, at \*7 (Tenn. Ct. App. Apr. 25, 2006) (quoting *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at \*15 (Tenn. Ct. App. June 3, 2003) ("A lack of wealth does not translate into a parent's inability to nurture, support, and provide for a child, just as having great wealth does not guarantee that a child will be loved, nurtured, and supported. However, when economic disadvantage, coupled with other factors, seriously impairs a parent's ability to support him or herself and his or her children, the Department may be required to step in to prevent the children from being victimized by neglect.")). Although Mother testified that she intended to save for an apartment, a car, and a driver's license, it appeared at the time of trial that she had not saved any money for any of these necessities despite having

excess income in some of the months prior to trial. Rather, after thirty months, Mother asks the court give her more time, promising that she will finally fulfill her commitments.

Mother's living situation is also still precarious. At the time of trial, Mother was living with a fiancé who was still married to another woman. Both she and her fiancé were residing with the fiancé's mother and boyfriend. Mother is aware that her fiancé is convicted felon, but was unable to state what crime or crimes he had committed. Moreover, although the home in which Mother is living was not shown to be inappropriate for the children, Mother informed DCS that this current living situation was merely temporary. Thus, another move is likely, to a home that may or may not be appropriate for the children. However, Mother could return to live with maternal grandmother. Still, this evidence shows that Mother's living situation is still fraught with instability. Moreover, the evidence shows that Mother is currently unable to independently support herself, much less a family having two children, without the support of others, leaving her with little to no control over her circumstances. Indeed, at the time of trial, Mother was again unemployed, but hoping for a new position following trial.

While we commend Mother on her progress toward sobriety, Mother's overall progress has undisputedly not resulted in the creation of a stable environment in which the children may return now or at any point in the near future. Although Mother contends that she will be able to provide a suitable environment for the children in a few short months, Mother's failure to provide a suitable environment for her children in the thirty months between removal and trial does not give this Court confidence that Mother's promises will be fulfilled. Moreover, as the trial court found, the children have already been in limbo for thirty months waiting on Mother; another six months of waiting and hoping is simply not justified. Rather, waiting for Mother to "work on" her plan for return of the children for the next six months only prevents the children from "early integration into a safe, stable and permanent home" with foster parents, who wish to permanently adopt the children into their safe and stable home. Tenn. Code Ann. § 36-1-113(g)(3)(C). Thus, the trial court did not err in finding that clear and convincing evidence supports this ground for termination.

### b. Willingness and Ability

Turning to the final statutory ground found by the trial court, parental rights can be terminated when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

- 10 -

Tenn. Code Ann. § 36-1-113(g)(14). This statutory ground is essentially two distinct elements that must each be proven by clear and convincing evidence:

> First, DCS must prove that [the parent] failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the child[ren].' DCS must then prove that placing the children in [the parent's] 'legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren].'

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (quoting Tenn. Code Ann. § 36-1-113(g)(14)). With regard to substantial harm, this Court has explained that

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, 2018 WL 1629930, at *7 (quoting ***Ray v. Ray***, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001) (footnotes omitted)).

The trial court's findings as to this ground are as follows:

> The mother . . . has failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody and financial responsibility of the children such that, placing legal and physical custody of the children with her would pose a risk of substantial [harm] to the children's physical and/or psychological welfare. Despite being given nearly two and a half years to stabilize her situation and ensure a safe and appropriate home for the children, she failed to do so. She has never maintained a home of her own and does not have such a residence now. She has been unable to maintain employment for longer than a few months at a time, and is now currently unemployed. She has not maintained her privilege to drive an automobile and does not have transportation even if she was to obtain her driver's license.
>
> Furthermore, after knowing her children had entered DCS custody in 2016, the mother became incarcerated on two occasions—serving considerable terms of imprisonment. Even when not incarcerated, the mother did not visit her children for nearly a period of eighteen (18) months [] until therapeutic visitation was begun in the spring of 2018. The mother

also failed drug screens and admitted to illicit drug use while her children were in foster care. She completed some assessments which indicated she has both mental health issues and substance abuse issues, but is currently not on medication and not receiving counseling. In conclusion, the mother is in no better position to raise her children in a safe and stable home as of this ruling, than she was [on] the date of the removal.

Mother first argues that the trial court erred in its decision as to this ground because the proof showed that she was willing to assume custody of the children. In particular, Mother's points out that "[n]owhere in the [trial court's] ruling is there any finding that Mother was unwilling to assume custody and financial responsibility [of the children]."

As an initial matter, we note that there has been some disagreement in this Court as to the proof required of this ground. *Compare In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018) (holding that the petitioner must prove both an inability and unwillingness to assume custody or financial responsibility of a child), *with In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018) (holding that the petitioner need only prove that "a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child."). More recently, courts have avoided this dispute by noting that the evidence was clear and convincing under even the more stringent standard. *See, e.g., In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019) (noting both *In re Ayden S.* and *In re Amynn K.* but ultimately concluding that DCS presented sufficient evidence that "Mother was not able or willing to assume physical or legal custody of or financial responsibility for the Child"); *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9-10 (Tenn. Ct. App. Oct. 29, 2018) *perm. app. denied* (Tenn. Jan. 22, 2019) (noting the split in authority but holding that it was unnecessary to choose one approach where the parent had manifested neither an ability nor a willingness to parent the child).

This Court took the same approach in *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *8 (Tenn. Ct. App. Apr. 17, 2019), noting that in order to determine a parent's willingness to assume custody, "'we look for more than mere words' and may consider whether a parent has attempted 'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *Id.* (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). Thus, a lack of effort can undercut a claim of willingness. *Id.* (citing *In re Cynthia P.*, 2019 WL 1313237, at *8); *see also In re J'Khari F.*, 2019 WL 411538, at *15 ("[A] parent's actions can demonstrate a lack of willingness to assume custody of or financial responsibility for the Child."). For example, we have previously held that evidence was sufficient to meet this ground when it showed that the parent voluntarily

chose to live a lifestyle lacking stability. *See **In re Morgan K.***, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *13 (Tenn. Ct. App. Oct. 31, 2018).

The same is true in this case. While Mother's words have indicated that she is willing to resume custody and financial responsibility for her children, her actions have betrayed her unwillingness to make the effort required for reunification. As the trial court found, although the children have been removed from Mother's custody for a significant period of time, her efforts to secure their return have been minimal. Mother failed to maintain any contact with the children for a significant period of time. Even once visitation resumed, Mother missed several opportunities to visit her children. Moreover, although Mother's employment is sporadic, the evidence showed that at times she was making a significant income without significant expenses, but apparently failed to use that income to obtain independent housing as she promised or her driver's license or a car so that she would not be reliant on third-parties for transportation or needed counseling and treatment for her mental health and addiction issues. This evidence that Mother was earning a solid income for approximately two months is significant in light of Mother's testimony that it would take "a couple of months, at most," for her to save up for an apartment at a similar rate of pay. Thus, Mother had ample opportunity to demonstrate her willingness to parent the children, but failed to make use of those opportunities. Moreover, there is ample evidence in the record that Mother is unable to assume custody or financial responsibility for the children, as Mother herself admitted that she lacks financial stability and needs more time to develop a plan for the return of the children. On the whole, the evidence therefore shows that Mother has not manifested either the ability or the willingness to assume legal and physical custody and financial responsibility of the children.

We also conclude that placing the child in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Here, the children were very young at the time of the removal and have had little to no contact with Mother for more than a year after the removal. One child suffered nightmares after visiting with Mother for fear of being removed from his current, stable family. In a similar situation, this court affirmed a finding of substantial harm on the basis that removal from the child's current family and placing the child with a near-stranger of a parent would cause the child emotional harm. ***State v. C.H.H.***, No. E2001-02107-COA-R3-CV, 2002 WL 1021668, at *9 (Tenn. Ct. App. May 21, 2002).

Mother's lack of stable living situation is also an issue. Although the home that Mother is currently staying in was not shown to be inappropriate for the children, Mother informed DCS that this living situation was merely temporary. Mother's previous home with maternal grandmother was not fit for children to live in. Mother's willingness to attend the children's medical needs was also troubling, as Mother allowed the children to

be plagued with skin sores while in her care.[7] Moreover, Mother still does not have an appropriate means of transportation, stable employment, or a consistent means of communication. Although Mother had been able to maintain her sobriety for some months at the time of trial, the record also shows that Mother has mental health issues that she allows to go untreated. Finally, Mother admits that she is currently not an appropriate placement for the children, as she is not currently financially stable and needs up to six months to "figure [] out" her plan for the return of the children. Thus, by Mother's own admission, she cannot currently provide a safe and stable home for her children and has not even yet formulated a plan to do so.

Stability, as this Court has often recognized, is an "extremely important" necessity for children. *See **In re Connor S.L.,*** No. W2013-00668-COA-R3-JV, 2013 WL 5230258, at \*7 (Tenn. Ct. App. Sept. 16, 2013) (quoting ***Hayes v. Pierret***, No. M2012-00195-COA-R3-CV, 2013 WL 3346847, at \*5 (Tenn. Ct. App. June 27, 2013)); *see also **In re DNG***, No. M2003-02810-COA-R3-PT, 2004 WL 2314534, at \*3 (Tenn. Ct. App. Oct. 13, 2004) ("[S]tability is important to a child's well-being."). Thus, in refusing to terminate on this ground, we would be subjecting the children to further limbo in the hope that Mother would finally obtain the stability necessary to parent her children. This continuing lack of stability in the children's life is both likely and harmful. *Cf. **In re Morgan K.***, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at \*13 (Tenn. Ct. App. Oct. 31, 2018) (affirming this ground on the basis that the parent's "permanent stability is tenuous" and the parent had taken "essentially no steps to prepare himself to be able to support and care for a toddler"); *see also **In re Maya R.,*** No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*7 (Tenn. Ct. App. Apr. 4, 2018) (upholding the termination of mother's parental rights for failure to manifest an ability and willingness to assume custody where mother's living situation remained unstable and itinerant). The trial court's finding as to this ground for termination is therefore affirmed.

## B. Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the children's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best interest." ***In re Audrey S.***, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. ***Id.***

---

[7] Mother also refused to vaccinate Mason based on her own research regarding vaccine injuries, but when asked about vaccine schedules answered that she did not know the answer because she was not a doctor. Mother also had no plan for Mason's education given his lack of vaccinations other than that they could "catch up" the vaccines.

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider

- 15 -

the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

The trial court made the following findings in support of its determination that the children's best interests were served by termination of Mother's parental rights:

There is no meaningful relationship between [Mother] and the children. The mother went eighteen months without visiting their children and has only seen the children a limited amount of time in a therapeutic setting more recently. Although they have been going better as time has passed, at least some of those therapeutic visits lead to adverse behavioral reactions in the children. Furthermore, the mother missed six (6) visits due to her lack of reliable transportation. . . .

[Mother has not] demonstrated an ability to take custody of these children. The mother has made some efforts as of late, but is still no closer to being in a position to actually care for her children. She does [not] have the means or stability to raise the children. She does not have a home, employment, or transportation. She has not addressed the underlying mental health and substance abuse issues in a meaningful and long term manner that would ensure stability moving forward. The children need and deserve permanency and a guardian, however, they cannot achieve that with their parents. There is no identifiable bond between [Mother] and the

- 16 -

children. In order for these children to achieve permanency, they will need a guardian who can take care of them and provide them with a forever home. The children's only realistic option for permanency is through adoption and the current foster family is willing and able to raise these children like their own blood. The children have a strong bond with their foster parents, will have their needs met in that home, and continue to thrive after being adopted by same.

The Court therefore finds that termination of [Mother's] parental rights is in the best interest of the children.

As an initial matter, Mother takes issue with the trial court's findings as to best interest, contending that they are insufficient. As previously discussed, the Tennessee Supreme Court has directed courts to consider all relevant factors. *See In re Gabriella D.*, 531 S.W.3d at 682. In addition, this Court has vacated termination orders that did not provide sufficient findings of fact, which violated both Rule 52.01 of the Tennessee Rules of Civil Procedure[8] and section 36-1-113(k).[9] *See In re Colton B.*, No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *5 (Tenn. Ct. App. Dec. 22, 2017). Although the trial court did not explicitly reference the factors contained in section 36-1-113(i), it is apparent from the trial court's findings both as a whole and specifically with regard to best interest that the trial court properly and sufficiently considered the best interest factors. For example, the trial court specifically found that Mother had no meaningful relationship with the children, a finding that coincides with the fourth factor in section 36-1-113(i)(4). The trial court also explicitly considered Mother's efforts to adjust her circumstances, see Tenn. Code Ann. § 36-1-113(i)(1) & (2), Mother's visitation, see Tenn. Code Ann. § 36-1-113(i)(3), the effect of a change in caretakers, see Tenn. Code Ann. § 36-1-113(i)(5), and Mother's drug and mental health issues, see Tenn. Code Ann. § 36-1-113(i)(6) & (8). Given the trial court's findings as a whole, we conclude that they are sufficient to facilitate appellate review.

Turning to the evidence presented, we agree that Mother has not made a lasting change in circumstances despite assistance from DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1) & (2). Here, although Mother has made some progress with her sobriety, she admits that she had not been able to achieve the kind of stability necessary for her children to be returned to her. Mother variously blames her lack of progress on her lack of knowledge of programs intended to help her and her lack of consistent employment. The record shows, however, that Mother was aware of certain resources that she could seek out but that she just did not make the effort to utilize those resources, such as

---

[8] Rule 52.01 provides that "[a]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment."

[9] Section 36-1-113(k) mandates that the trial court "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."

Alcoholics Anonymous meetings. Moreover, at times, Mother was earning a sufficient income but appears not to have used those funds to further her efforts toward reunification. These factors therefore weigh in favor of termination.

The evidence also does not preponderate against the trial court's finding that Mother's relationship with the children is not meaningful and that Mother has not properly exercised visitation with the children. *See* Tenn. Code Ann. § 36-1-113(i)(3) & (4). The children were removed from Mother when they were very young. Thereafter, Mother went approximately eighteen months without any contact with children, despite the fact that she was incarcerated for less than half of that period. When visitation finally resumed, Mother resorted to showing the children pictures of herself together with the children so that they would remember her. Even now, Mother continues to miss a substantial number of visitations. Although the children now refer to Mother as "Mom," their relationship with Mother has simply not been able to become meaningful due to Mother's inability to maintain consistent contact with the children. Again, these factors weigh in favor of termination.

A strong factor in favor of termination is the effect of a change in caretakers on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). The children were placed with foster family at a very young age and had been living with Foster Family uninterrupted for over two years at the time of trial. As such, both children have lived with foster parents longer than with Mother. The evidence shows that both children are strongly bonded and thriving in the care of Foster Family. Their needs, including medical attention, supervision, and stability, are all being met by foster parents. Foster Family hopes to adopt the children and is willing to maintain contact with Mother. In contrast, Mother was unable to meet these needs at the time the children were removed and had made little progress in her effort to meet the children's needs by the time of trial. Indeed, Mother herself testified that she was not yet ready to be a permanent placement for the children.

There can also be no dispute that the children were subject to neglect prior to their removal, as the children lacked supervision, lacked a clean home to live in, and appeared to be suffering from rather severe skin maladies. *See* Tenn. Code Ann. § 36-1-113(i)(6). The record also contains troubling evidence concerning Mother's steps to address her drug abuse and mental health concerns. *See* Tenn. Code Ann. § 36-1-113(i)(7) & (8). Although Mother was consistently passing drug screens by the time of trial, it appears that Mother was not enrolled in any counseling or program to maintain her sobriety, despite the recommendations of assessments in which she participated. Moreover, Mother was not currently being treated for her admitted mental health issues. Although Mother again claimed an inability to pay as the basis for her failure to seek treatment and testified that she was planning to work on this issue, a DCS worker testified that Mother was resistant to medication. Moreover, it appears that Mother was only seeking alternative methods of paying for her treatment at the time of trial, two years after the removal of the children. These factors weigh in favor of termination.

Finally, the evidence concerning Mother's payment of child support was mixed. *See* Tenn. Code Ann. § 36-1-113(i)(9). When Mother was working, it appears that she made a voluntary effort to have the ordered amount of child support garnished from her wages. However, Mother was unable to work for a considerable period of time by her own voluntary decision to engage in criminal activity. As such, this factor is neutral.

In sum, the bulk of the factors support termination in this case. Most importantly, Mother has not developed a meaningful relationship with the children through her own actions and a change in caretakers would be devastating for the children. Moreover, Mother's inability to achieve stability in the thirty months that the children have been removed means that any goal of reunification is, at best, still months away. Instead, it appears that Mother is no closer to providing a safe and stable home for her children than she was when they were placed in DCS custody. In contrast, Foster Family has a stable home ready and willing to fully envelop the children into its embrace. Under these circumstances, the children's best interests are served by terminating Mother's parental rights.

## VI.   CONCLUSION

The judgment of the Trousdale County Circuit Court is affirmed and this cause is remanded for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Selah W., for which execution may issue if necessary.

_____
J. STEVEN STAFFORD, JUDGE